CITIZENS ENERGY COALITION OF INDIANA, INC., et al.

v.

Theodore L. SENDAK et al.

No. IP 78–352–C.

United States District Court, S. D. Indiana, Indianapolis Division.

Oct. 16, 1978.

Louis Rosenberg and Sheila Farrell Rosenberg, Indianapolis, Ind., for plaintiffs.

Alan L. Crapo, Jr., and Lon E. Mullins, Deputy Attys. Gen., Indianapolis, Ind., for defendants.

Richard A. Young of Young & Young, Indianapolis, Ind., for defendant Frank J. Biddinger.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STECKLER, Chief Judge.

This action arises from the disapproval by the Attorney General of the State of Indi-

ana of a proposed contract[1] between the Public Counselor of the State of Indiana and the Citizens Energy Coalition of Indiana, Inc., d/b/a Citizens Action Coalition of Indiana. Plaintiffs' complaint alleges in substance that the defendants have violated their constitutional rights by the Attorney General's alleged policy of refusing to approve contracts between a state agency and an organization which employs a lobbyist and the Public Counselor's policy of refusing to consider applications for monetary grants from such organizations under the Energy Conservation and Production Act, 42 U.S.C. § 6805 (1976).[2] Plaintiffs seek injunctive relief and also sue in quantum meruit for Five Thousand Dollars ($5,000.00) in monetary damages for work performed under the proposed contract. The Attorney General's policy allegedly stems from his interpretation that the proposed contract between the Public Counselor and Citizens Action Coalition may conflict with Ind.Code 2–4–3–7 (1978).[3] The Public Counselor's policy is derived from his understanding of the Attorney General's policy concerning organizations which employ lobbyists.

1. Ind.Code 4–13–2–14 (1978) provides in pertinent part:

"All contracts [by state agencies] . . . shall be approved as to form and legality by the attorney-general." ·

2. The Energy Conservation and Production Act, 42 U.S.C. § 6805 (1976), provides in pertinent part:

"(a) The Administrator may make grants to States . . . , under this section to provide for the establishment and operation of offices of consumer services to assist consumers in their presentations before utility regulatory commissions. Any assistance provided under this section shall be provided only for an office of consumer services which is operated independently of any such utility regulatory commission and which is empowered to—

(1) make general factual assessments of the impact of proposed rate changes and other proposed regulatory actions upon all affected consumers;

(2) assist consumers in the presentation of their positions before utility regulatory commissions; and

(3) advocate, on its own behalf, a position which it determines represents the position most advantageous to consumers, taking into account developments in rate design reform."

After commencing this action, plaintiffs filed a motion for a preliminary injunction and defendant Attorney General Sendak filed a motion to dismiss. Having heard evidence and oral arguments on the motions on August 16, and 17, 1978, this Court now makes the following findings of fact and conclusions of law and issues its preliminary injunction in accordance therewith. By reason of its findings and conclusions, the Court hereby DENIES defendant Sendak's motion to dismiss the action as against him in his official capacity and in his individual capacity. On motion of the defendant Biddinger, the action was previously dismissed as against him in his individual capacity.

## FINDINGS OF FACT

1. The Citizens Energy Coalition, Inc. (hereinafter CAC) is a private, not-for-profit organization which was incorporated in the State of Indiana in 1975. CAC maintains its headquarters in Indianapolis, but has local affiliates throughout the service territories of the major Indiana electric

3. Ind.Code 2–4–3–7 (1978) provides in pertinent part:

"Lobbying for pay by public officials or members of the press prohibited . . .—It shall be unlawful for any public official of this state, or of any county, township, city or town, including elective and appointive officers and employees, or any officer, member or employee of any state central committee of any party, to receive any compensation to appear before the general assembly of the state of Indiana, or before either house or any committees of the general assembly or either house thereof or before any member as a legislative counsel or agent on behalf of any person, firm, corporation or association from which he directly or indirectly receives any compensation or salary, other than the state of Indiana, or the county, township, city, town or state central committee with which he is associated."

Ind.Code 2–4–3–9 provides:

"Penalty.—A person who recklessly violates this chapter commits a class A misdemeanor. The attorney general, upon information, shall bring prosecutions under this section."

utilities. CAC has no less than 1,200 individual members and organizational members who represent over 250,000 Indiana citizens. CAC's governing board and membership include persons from diverse areas, backgrounds and occupations. One of CAC's principal purposes is to represent the interests of residential utility ratepayers. It has intervened in several rate and rule-making proceedings of the Public Service Commission of Indiana (hereinafter PSCI) and has registered a lobbyist to appear before the Indiana General Assembly in 1976, 1977, and 1978.

2. Fritz Wiecking (hereinafter Wiecking) is CAC's Executive Director.

3. The Indiana Public Interest Research Group (hereinafter InPIRG) is a private, not-for-profit organization, which was incorporated in the State of Indiana in 1973. InPIRG has 3,000 dues paying members, most of whom are students at the Bloomington campus of Indiana University. InPIRG's governing board consists of students, faculty and community representatives from the Bloomington vicinity. InPIRG's principal purposes are to provide its members with an educational experience in public policy research, provide useful data to Indiana policymakers and advocate consumer and environmental interest. InPIRG has published several studies on Indiana public policy questions, has participated in a few PSCI proceedings and has had registered lobbyists during the 1975, 1977, and 1978 sessions of the Indiana General Assembly.

4. Thomas Wathen (hereinafter Wathen) is the Staff Director of InPIRG.

5. Theodore L. Sendak (hereinafter Attorney General) is the Attorney General of Indiana. Alan Crapo is an Assistant Attorney General, who, among his other duties, is principally responsible for reviewing state contracts as to legality and form.

6. Frank J. Biddinger (hereinafter Public Counselor) is the Public Counselor of Indiana.[4]

7. In August of 1977, the grant application of the Public Counselor to the United States Federal Energy Administration (hereinafter USFEA), now the Department of Energy (DOE), was approved by the Indiana Attorney General as to "form and legality."

In September of 1977 the DOE approved the application for $200,000.00 under 42 U.S.C. § 6805 and the Public Counselor's office was approved as an "office of consumer services" to assist consumers in their presentations before the Indiana public utility regulatory commission. The period during which the funds were to be spent was September 30, 1977 through September 29, 1978. Eighty-four thousand dollars ($84,000.00) of the grant was allocated for financial and technical assistance to consumer groups in order to facilitate participation in utility rate proceedings. Five thousand dollars ($5,000.00) was budgeted for bringing together consumer groups regarding utility regulation matters and for the development of guidelines to govern the administration and distribution of financial assistance to consumer groups.

8. The Public Counselor was required to submit guidelines to the Department of Energy (DOE) by February 2, 1978.

9. On December 21, 1977, CAC and the Public Counselor executed a proposed contract whereby, among other undertakings, CAC would perform or provide the following:

(1) Technical assistance in preparation of a grant for ECPA Section 205 funding.

(2) Preparing draft copies of guidelines for administering subgrants and contracts for ECPA Section 205 funding.

(3) Arrange meetings of consumer groups and potential subgrantees to analyze and discuss funding and/or provision of technical assistance for electrical utility interventions.

(4) Technical assistance in planning and setting up a "Consumer Advisory

4. The authority and duties of the Public Counselor are prescribed by Ind.Code 8–1–1–4 (1978) as set out in the Appendix.

Committee" to provide strategic and tactical input into the planning of the Office of the Public Counselor and to help set out priorities for the Office's regulatory work.

(5) Technical assistance in drafting a proposed litigation/intervention/action strategy for approaching the Public Service Commission's regulation of electric utilities.

In consideration for the performance of the contract CAC was to be paid $5,000.00. The Public Counselor and the CAC understood that CAC would have to perform in time for the Public Counselor to submit the guidelines to DOE by February 2, 1978.

10. Under the statute, 42 U.S.C. § 6805, and the DOE rules and regulations, 10 C.F.R. § 460 (1978), prior to the expenditure of any grant funds and no later than six months from the date of notification of the grant award made under the regulations, the grantee had to have in existence, or was required to establish a consumer-interest office meeting the requirements of the Act and the DOE rules and regulations, and in addition was required to establish procedural guidelines for administering the grant or financial assistance to eligible consumer groups to enable them to make presentations before utility regulatory commissions. The purpose of the contract of December 21, 1977, was to assist the Public Counselor in establishing the procedural guidelines for administering the grant award to his office, and to meet the requirements of the regulations governing financial assistance or subgrants to eligible consumer groups. In other words, to assist the Public Counselor in meeting the minimum program requirements to enable that office to provide technical and financial assistance to eligible consumer-interest groups, such as CAC itself. The grant application to DOE from the Public Counselor specifically mentioned the Public Counselor's intent to contract with CAC for the technical assistance described above.

11. Except for a 30-minute conference on January 30, 1978, between the Public Counselor and Wiecking, by January 24, 1978, CAC fully performed its duties under the December 21 contract.

12. The Public Counselor had no prior authority from any of the other state officials to proceed with or authorize work to proceed under the alleged contract. The Public Counselor alone cannot bind the state. Other signatures are required before any contract is valid, in this instance the signatures of the Attorney General, the Governor, and the State Budget Director.

13. On January 25, 1978, CAC registered with the Secretary of the State of Indiana that it had designated Fritz Wiecking as its legislative agent for the remainder of the second session of the 100th Indiana General Assembly. The application for registration stated that the subject matter of the lobbying may include any issues affecting the Public Service Commission of Indiana and the office of the Public Counselor. Mr. Wiecking acted as CAC's legislative agent from January 25, 1978, until the adjournment of the 100th General Assembly on March 4, 1978.

On January 11, 1978, InPIRG registered with the Secretary of the State of Indiana that it had designated Thomas Wathen as one of its legislative agents for the remainder of the second session of the 100th Indiana General Assembly. Thomas Wathen acted as InPIRG's legislative agent from January 11, 1978, until the adjournment of the 100th General Assembly on March 4, 1978.

14. On February 8, 1978, fifteen (15) days after completion of the proposed contract, the same was submitted to the State Budget Agency. This was forty-nine (49) days after the proposed contract had been signed by representatives of CAC and the Public Counselor. On February 14, 1978, the contract was submitted to the office of the Attorney General for his approval. On February 14, 1978, the contract was returned to the office of the Public Counselor by Assistant Attorney General Alan T. Crapo because of a mistake in attestation of the signature of Mr. Fritz Wiecking. On March 14, 1978, the contract was returned to the office of the Attorney General.

15. On March 29, 1978, the Attorney General disapproved the proposed contract in a letter signed by Assistant Attorney General Alan L. Crapo. In his letter Crapo stated:

"This letter is pursuant to our review of the above named contract which involves your agency and the Citizens Energy Coalition of Indiana, Inc., d/b/a Citizens Action Coalition of Indiana.

"We are in receipt of information that Citizens Action Coalition of Indiana maintained a registered lobbist [sic] in the 1978 session of the General Assembly in the person of Mr. Fritz Wiecking who has signed the contract as executive director for the organization.

"Because of the above situation we are unable to approve this contract as it would have the effect of tending to lessen the performance of public duties. *See Cheney v. Unroe* (1906), 166 Ind. 550, 77 N.E. 1041 and *Secretary of State v. Indiana State AFL–CIO and Willis Zagrovich* (1978) Ind., 371 N.E.2d 1343 (opinion attached). Moreover, a conflict may arise under the terms of IC 2–4–3–et seq.

"Therefore we are unable to approve the subject contract as it appears to create a conflit [sic] of interest. I would be happy to discuss this matter and answer any questions you may have."

16. The only topic on which InPIRG lobbied in 1978 was the duration of Indiana's statute of limitations on manufacturer's product liability. CAC lobbied in 1978 on utility customer service standards and on "ex parte" contacts with PSCI commissioners. Neither organization lobbied on legislation directly affecting the Public Counselor, nor on appropriations for the Office of the Public Counselor. Neither organization was requested to lobby on a particular piece of legislation or issue by the Public Counselor. The Court finds that none of the party plaintiffs were acting as lobbyists on behalf of the Public Counselor.

17. The Court finds that the Public Counselor would not directly or indirectly receive compensation for lobbying by virtue of the DOE grant program or the proposed contract with CAC.

18. On April 5, 1978, the Public Counselor, by letter with supporting affidavits, requested reconsideration of the disapproval on the grounds that the December 21, 1977 contract was almost completely performed prior to CAC's registration as an employer of a legislative agent.

19. On or about April 12, 1978, the guidelines of the Public Counselor governing grants to consumer groups under 42 U.S.C. § 6805 were approved by DOE. The guidelines do not disqualify lobbying consumer groups from applying for or receiving aid. The disqualifying condition has not been published by the Public Counselor or approved by DOE.

20. On April 14, 1978, the Office of the Attorney General returned the Public Counselor's letter and enclosures of April 5 with a covering memo stating: "A. G. will not accept lobbyist or organization on contract." This evidence comes closest to any proof that the Attorney General's nonacceptance of the "Organization" was arbitrary in nature.

21. On April 17, 1978, the Public Counselor, by letter, requested the advice of the Attorney General on whether or not he could make grants under the 42 U.S.C. § 6805 program to consumer groups who had lobbied in the preceding session of the Indiana General Assembly. No formal or informal *written* response was ever made to this request.

22. In a letter dated May 24, 1978, CAC and Fritz Wiecking, by legal counsel, requested the Attorney General to approve the December 21 contract on the grounds that the Attorney General's objections were groundless. The Attorney General has not responded to said letter.

23. All grants by DOE channeled through the office of the Public Counselor are subject to the requirements of Indiana law in addition to any federal requirements.

24. On January 15, 1978, CAC intervened in Cause No. 35214 before the PSCI concerning a request by Public Service Company of Indiana, Inc. for a rate in-

crease which would increase annual revenues by $75.3 million. On January 24, 1978, CAC intervened in Cause No. 35132 before the PSCI concerning a request by Indianapolis Power and Light Company for a rate increase which would increase annual revenues by $52 million. On February 16, 1978, CAC intervened in Cause No. 35251 before the PSCI concerning a request by Indiana and Michigan Company for a rate increase which would increase annual revenues by $97 million. CAC expected to pay for attorney and witness fees related to the above proceedings through grants from the Public Counselor under 42 U.S.C. § 6805.

25. Prior to learning of the Attorney General's disapproval of the December 21 contract, CAC, according to plaintiffs' testimony, incurred approximately $3,000.00 in legal expenses in preparation for the causes referred to above. That testimony, however, is not supported by documentary evidence or office records.

26. Subsequent to learning of the Attorney General's disapproval of the December 21 contract, CAC incurred no further expenses in relation to the proceedings referred to in paragraph 24 and ceased all preparation of expert testimony.

27. In April of 1978, InPIRG applied for $9,785.00 in financial assistance under 42 U.S.C. § 6805 from the Public Counselor. InPIRG proposed to study the projections in demand for electricity made by Indiana utilities and the relationship of these projections to rate increase requests. InPIRG intended that this study would be introduced as evidence in Cause No. 35214 before the PSCI and would be similarly utilized in subsequent electric utility, general rate proceedings.

28. In March of 1978 and on May 22, 1978, CAC submitted to the Public Counselor proposals for financial assistance under 42 U.S.C. § 6805 in order to pay for attorney and witness fees in the three rate proceedings in which CAC had intervened. CAC's three requests totaled $46,000.00.

29. In letters dated May 30 and May 31, 1978, the Public Counselor refused to consider applications for assistance of CAC and InPIRG respectively, on the grounds that he was unable to do so as a result of his understanding of the Attorney General's policy on the legality of contracts with lobbyists.

30. The Public Counselor refused to consider an application for financial assistance under 42 U.S.C. § 6805 from the Indiana State AFL–CIO on the grounds that that consumer group had lobbied during the preceding session of the Indiana General Assembly and therefore was ineligible as a result of his understanding of the Attorney General's policy.

31. Three of the four consumer groups who applied for financial assistance under 42 U.S.C. § 6805 were rejected as a result of the Public Counselor's interpretation of the Attorney General's policy, and no contracts for subgrants were executed by those groups and the Public Counselor. The subgrant applications by the three groups had never been approved by the Public Counselor nor submitted to the Attorney General.

32. The Public Counselor has approved an application for financial assistance under 42 U.S.C. § 6805 in the amount of approximately $24,000.00 from the Consumer Center of Fort Wayne, Indiana. The Consumer Center did not lobby or retain a lobbyist in the preceding session of the Indiana General Assembly. The Attorney General has not approved the grant because of this pending suit.

33. In the context of the controversy as a whole, the Court is persuaded to believe and thus to find that the Attorney General's policy precluded the Public Counselor from entering into any contracts by a consumer group which had a registered or paid lobbyist.

34. In a letter received on or about June 12, 1978, DOE directed the Public Counselor to refrain from spending or committing any further funds allocated for the provision of financial and technical assistance to consumer groups until such time as the lobbyist issue is resolved.

35. Except for the lack of funds, there is no evidence before this Court that any of

the plaintiffs or any of the individual members therein were precluded from participating in any matter before the Public Service Commission of Indiana or to appear before the Indiana General Assembly.

36. InPIRG and an affiliate of CAC have contracted with Indiana government agencies other than the Public Counselor and both CAC and InPIRG will seek such contracts in the future. In addition to the December 21, 1977 contract and the proposals for financial assistance of March, April, and May 22, 1978, CAC and InPIRG intend to apply for other funds from the Public Counselor under 42 U.S.C. § 6805.

37. CAC and InPIRG intend to designate lobbyists during the future sessions of the Indiana General Assembly.

38. As a result of the actions of the Attorney General CAC's participation in the proceedings referred to in paragraph 24 were substantially diminished in that they were unrepresented by legal counsel during most of the proceedings and were unable to introduce expert testimony. InPIRG was unable to participate in the PSCI proceeding referred to in paragraph 27 or prepare the study for which it sought a grant from the Public Counselor.

39. Unless this Court enjoins the Attorney General and Public Counselor from implementing the policy of disqualifying lobbying consumer groups from contracting with the Public Counselor for the receipt of assistance under 42 U.S.C. § 6805, CAC, InPIRG, and other lobbying consumer groups will be unable to participate in the Federal Energy Conservation and Production Act grants.

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact the Court makes the following conclusions of law:

■ 1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), and pendent jurisdiction over the state claims. The constitutional claims in this action are substantial. For purposes of establishing jurisdiction under 28 U.S.C.

§ 1343(3), it is irrelevant whether or not a public official is acting in accordance with state law, so long as said person, acting under color of state law, has arguably deprived another person of rights secured by the Federal Constitution. In the case at bar, each of the defendants acted under color of Indiana law.

2. The Court declines to abstain from the exercise of its federal jurisdiction, and the Court in its discretion will accept pendent jurisdiction of the state law claim based on quantum meruit in relation to the proposed contract of December 21, 1977.

■ 3. The Court concludes that both the corporate entities and individual plaintiffs have standing to sue. A person denied the right to apply for governmental benefits has standing to complain of the denial whether or not it can be shown to a certainty that the benefits would have been granted had the person been permitted to apply. While the thrust of the Attorney General's standing to sue argument was directed at InPIRG and Wathen, InPIRG does have standing to complain of those policies of the defendants which resulted in the refusal of the Public Counselor to consider InPIRG's application for financial assistance under 42 U.S.C. § 6805. InPIRG has standing to complain of those policies of the Attorney General which jeopardize its right to contract with or receive grants from other Indiana governmental bodies. InPIRG and Wathen have standing to complain of those policies of the defendants which burden their rights to petition government individually and collectively by employing lobbyists.

4. Ind.Code 4–13–2–14 provides that all contracts entered into by state agencies shall be approved as to form and legality by the Attorney General. No contract with a state agency is legally binding until such approval has been secured.

■ 5. The Attorney General exercises a quasi-judicial professional discretion when approving contracts pursuant to Ind.Code 4–13–2–14. However, in determining whether to approve or disapprove state con-

tracts, the Attorney General may only consider the legality and form of the proposed contract. The Attorney General has a mandatory duty to approve all contracts which are lawful as to form and content. The Attorney General has no discretion to reject a contract which is lawful as to form and content; he is not a party to the contract.

■ 6. The Attorney General has misapplied Ind.Code 2–4–3–7 (1978), the lobbying for pay by public officials statute, to the parties and the facts of this case. Plaintiffs are neither public officials nor employees within the meaning of the statute.

If an application for financial assistance or a subgrant pursuant to 42 U.S.C. § 6805 were allotted to CAC or InPIRG, said parties would not become public officials or employees within the meaning of Ind.Code 2–4–3–7. Moreover, the awarding of such a grant is not tantamount to indirect compensation to the Public Counselor for lobbying.

■ 7. To disapprove the contract of December 21, 1977, solely on the grounds that the contract would be in conflict with Ind.Code 2–4–3–7 would be an erroneous disapproval. However, in view of the specific provisions of the contract of December 21, 1977, defining the nature and scope of the engagement of the parties, the Court cannot conclude that the Attorney General acted erroneously or that the disapproval of the contract was a clear abuse of his quasi-judicial discretion. Here the contract was disapproved on the grounds that the contract "would have the effect of tending to lessen the performance of [the Public Counselor's] public duties." The potential influence on the discretion of the Public Counselor in the performance of his duties and operation of his office was extensive. As stated in the Court's findings, the contract specified that CAC would render:

"(4) Technical assistance in planning and setting up a 'Consumer Advisory Committee' to provide strategic and tactical input into the planning of the Office of the Public Counselor and to help set out priorities for the Office's regulatory work.

"(5) Technical assistance in drafting a proposed litigation/intervention/action strategy for approaching the Public Service Commission's regulation of electric utilities."

In view of this far-reaching language of this particular contract, reasonable minds could draw different conclusions as to the effect the parties' mutual obligations and their performance under the contract might actually have, or tend to have, on the performance of the Public Counselor's public duties. Therefore the Court concludes that it was within the discretion of the Attorney General to disapprove the contract on that ground, but not on the ground that the contract might conflict with Ind.Code 2–4–3–7. While the Attorney General was acting within his discretion in disapproving the particular contract of December 21, 1977, he would be acting outside the scope of his discretionary duties, or would be abusing his quasi-judicial discretion, if he were to disapprove, on the same basis, contracts or subgrants for financial assistance to consumer groups to make presentations before a utility regulatory commission. It is one thing to enter into a contract directed toward the Public Counselor's office meeting the requirements of 42 U.S.C. § 6805 and the regulations thereunder, and quite another for an eligible consumer group to apply for and receive a subgrant or financial assistance for the purpose of intervening and making presentations in proceedings before a utility regulatory commission.

■ 8. A policy of the Attorney General of refusing to approve contracts for subgrants or financial assistance between the Public Counselor and consumer groups who have employed lobbyists solely on the basis of their lobbying activity, and the Public Counselor's refusal to consider applications for subgrants under 42 U.S.C. § 6805 by consumer groups who have employed lobbyists, by reason of the Attorney General's policy, violate 42 U.S.C. § 1983 by depriving plaintiffs of their first amendment right to petition the government and their right to equal protection of the laws guaranteed by the fourteenth amendment of the Constitution.

9. The policy of the Attorney General creates two classes: persons or organizations who have lobbied, and those who have not lobbied. The policy of the Attorney General and the Public Counselor invidiously discriminates against that class of lobbyists who would exercise the fundamental right to petition the government.

10. A valid state law such as Ind. Code 2–4–3–7 cannot be applied in a way to thwart the exercise of a right guaranteed by the Constitution and laws enacted by Congress. *See NAACP v. Thompson,* 357 F.2d 831, 833 (5th Cir.), *cert. denied,* 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58 (1966).

11. The Attorney General's policy burdens and deters the exercise of the first amendment right to petition the government. Persons and organizations such as plaintiffs are confronted with a dilemma: forsake lobbying or give up the right to seek contracts or subgrants from the State of Indiana.

12. The first amendment and the fourteenth amendment to the United States Constitution protect speech directed to influencing legislation, including the employment of lobbyists.

13. Under the first and fourteenth amendments, a state may not directly abridge lobbying activities or indirectly abridge such activities by withholding government benefits from those persons who lobby or retain lobbyists.

14. Substantial infringements of the right to lobby must be justified by a compelling state interest, and said interest must be effectuated in that manner which least restricts lobbying.

15. The burden is on the defendants to show the existence of a compelling state interest. Moreover, it is not enough that the means chosen in furtherance of the interest be rationally related to that end. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, and the government officials must employ means closely drawn to avoid unnecessary abridgement. *Elrod v. Burns,* 427 U.S. 347, 362–63, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

16. Indiana's interest in assuring that state and municipal officials execute their duties with exclusive fealty to the public good is not rationally related to the policy of prohibiting said officials from contracting with or making subgrants to lobbyists. Even if the policy were rationally related to a compelling state interest, the policy does not result in a gain which outweighs the loss of first amendment rights, nor is it closely drawn to avoid unnecessary abridgement of the right to petition the government.

17. Indiana's interest of assuring disinterested public administration and avoiding an appearance of impropriety can be promoted by policies less restrictive of the right to petition government.

18. The continuation of the policies complained of in this complaint, together with the spectre of criminal prosecution, will have a chilling effect on the exercise of the right to petition government by persons and organizations whose lobbying activities pose no threat to any lawful interest of the State of Indiana.

19. The Attorney General's policy effectively eliminates most of the eligible consumer groups from consideration for grants under the DOE. Criteria for eligibility are set out in 10 C.F.R. § 460.14 (1978). There is no question that the regulations leave some latitude in setting priorities to the state office which allocates the grants, 10 C.F.R. § 460.12(b)(3) (1978), yet the guidelines for setting these priorities are to be submitted to DOE for approval. 10 C.F.R. § 460.12(b) (1978). To permit the disqualification of the most effective consumer groups is to subvert the purpose and language of the federal law governing the consumer aid program.

20. The Attorney General, acting in his quasi-judicial capacity, is immune from liability for monetary damages. However, this immunity does not extend to injunctive relief. *Drollinger v. Milligan,* 552 F.2d 1220, 1226 (7th Cir. 1977); *Littleton v.*

*Berbling,* 468 F.2d 389 (7th Cir. 1972), *rev'd on other grounds sub nom., O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

■ 21. Federal courts should act cautiously and with reluctance in issuing injunctions against the activities of state officers discharging in good faith their supposed official duties. However, plaintiffs are entitled to relief in the form of a preliminary injunction preventing the further implementation of the policy at issue. Substantial and irreparable injury will result to plaintiffs and to the public interest if this Court does not act. Not only have the actions at issue paralyzed the federal funding for Indiana consumer groups in the fiscal year which ended on September 29, 1978, but continuation of funding for the entire program in the future may be in jeopardy.

Plaintiffs have shown that the law is in their favor and that they are more likely than the defendants to succeed on the merits. Plaintiffs have no adequate remedy at law.

Any damage to defendants is far outweighed by the harm which will result to the consumer interests if the imminent destruction of the program under 42 U.S.C. § 6805 is not averted.

22. A preliminary injunction consistent with the foregoing shall issue.

### APPENDIX

8–1–1–4 [54–111]. Public counselor—Appointment—Term—Salary—Removal—Qualifications—Duties—Power and authority—Expenses.—(a) The governor shall appoint a public counselor, for a term of four [4] years at a salary to be fixed by the governor. The public counselor shall serve at the will and pleasure of the governor. The counselor shall be a practicing attorney, and qualified by knowledge and experience to practice in public utility proceedings. For any public counselor first appointed after April 30, 1977, said public counselor shall apply his full efforts to the duties of the office and may not be actively engaged in any other occupation, practice, profession or business.

(b) The counselor may appear on behalf of rate payers, patrons and the public in all hearings before the commission, in appeals from the orders of the commission and in all suits and actions in any court which may involve rates for service, services, extensions and contracts for service, valuations of utilities, applications of utilities for authority to issue securities, applications for mergers and sales and in all other proceedings, including proceedings before federal agencies, and suits and actions in which the subject matter of the action affects the patrons of any utility doing business in this state. He shall decide whether to appeal an order of the commission, and may on his own motion initiate any appeal.

(c) Upon the institution of any proceeding before the commission in which the public counselor is authorized to appear, the commission shall immediately notify the public counselor thereof and transmit to him a copy of the petition or complaint filed. The counselor is empowered to call his own witnesses to testify before any proceeding or hearing in which he makes an appearance, and to require the production for examination of any books and papers relating to any matter under investigation and in question before the commission, any other agency or any court. The counselor shall have the right, with the consent of the petitioners or complainants, when the petition is filed on behalf of the rate payers, patrons or the public, to make such amendments to the petition or complaint as he may deem advisable. The commission shall not proceed to hear any petition, complaint or proceeding in which the public counselor is entitled to appear until he shall have had at least ten [10] days' notice thereof, unless he shall have waived the same. In all proceedings before the commission and in any court in which he shall appear, the counselor shall have charge of the interests of the rate payers and patrons of the utility and utilities involved and he may give notice of such hearings to all municipalities, corporations, or organizations and persons parties

to the proceedings, suit or action, other than such utility or utilities. In addition to notice given by the public counselor, the commission shall give the notices otherwise required by law.

(d) The public counselor shall be entitled to employ and fix the compensation, with the approval of the governor and the budget agency accountants, utility economists, engineers, attorneys, stenographers or other help as may be necessary to carry out the duties of his office. The compensation of the public counselor and staff shall be paid from an appropriation made for that purpose by the general assembly, or with the approval of the governor and the budget agency from a contingency fund established under IC 8–1–6–1. Services of all engineers, experts and accountants of the commission may be availed of by the public counselor in the performance of his duties as such, and they shall make such appraisals and audits as the public counselor may request, and he shall have access to the records and files of the commission: Provided, That with the advice and consent of the governor the counselor may employ additional stenographers, examiners, experts, engineers, assistant counselors, accountants, and consulting firms with expertise in utility economics or management, or both, at such salaries and compensation and for such length of time as the governor and the budget agency may approve for any particular case or investigation; the compensation together with cost of transportation, hotel, telegram and telephone bills of the employees and the counselors while traveling on public business shall be paid from the expert witness fee account, or with the approval of the governor and the budget agency from a contingency fund established under IC 8–1–6–1 on warrants drawn by the auditor of state, sworn to by the parties who incurred the expenses. After the same shall have been approved by the public counselor any expenses incurred by the regular staff of the public counselor, or any expense incurred by the public service commission of Indiana, either upon complaint against any public utility, or upon petition of any public utility shall be charged and

paid in the manner provided in IC 8–1–2–70. Nothing in this section shall be construed to prevent any party interested in a proceeding, suit or action from appearing in person or from being represented by counsel. [Acts 1941, ch. 101, § 4, p. 255; 1945, ch. 46, § 2, p. 92; 1959, ch. 370, § 1, p. 993; 1974, P.L. 27, § 1, p. 134; 1977, P.L. 98, § 1, p. 482.]