**MOTHER GOOSE NURSERY SCHOOLS, INC., an Indiana Not-For-Profit Corporation, Plaintiff-Appellee,**

**v.**

**Theodore L. SENDAK, Individually and as Attorney General of the State of Indiana, Defendant-Appellant.**

Nos. 84–2318, 84–2921.

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1985.

Decided Aug. 14, 1985.

Rehearing and Rehearing En Banc Denied Oct. 1, 1985.

Rosalie B. Levinson, Merrillville, Ind., for plaintiff-appellee.

David Michael Wallman, Office of Atty. Gen., Indianapolis, Ind., for defendant-appellant.

Before BAUER and COFFEY, Circuit Judges, and GRAY, Senior District Judge.[*]

BAUER, Circuit Judge.

Mother Goose Nursery Schools, Inc. (Mother Goose), an Indiana Not-for-Profit Corporation sued the then Attorney General of Indiana, Theodore L. Sendak,[1] under 42 U.S.C. § 1983 seeking damages for Sendak's refusal to approve a proposed contract for child care services between Mother Goose and the Indiana State Department of Public Welfare. The district court granted the plaintiff's motion for summary judgment on December 16, 1980. *Mother Goose Nursery Schools, Inc. v. Sendak*, 502 F.Supp. 1319 (N.D.Ind.1980). The Court found Sendak personally liable for violating Mother Goose's constitutional rights but deferred a decision on damages so that the court could take evidence on that issue. On June 29, 1984, the district court issued the final judgment awarding Mother Goose $28,248.75. *Mother Goose Nursery Schools, Inc. v. Sendak*, 591 F.Supp. 897 (N.D.Ind.1984). On July 31, 1984, Mother Goose filed its motion for fees and costs with the district court. On October 23, 1984, the court awarded Mother Goose $13,352.00 for attorney fees and $401.39 for costs.[2] We reverse the judgments of the district court on the grounds that the Attorney General in this case is absolutely immune from liability for damages under Section 1983.

I

Mother Goose has been licensed as a day care nursery in Indiana since 1954. Beginning in November 1975, Mother Goose entered into three yearly contracts with the Indiana Department of Public Welfare for the provision of day care services and transportation to children of parents participating in the Aid to Families with Dependent Children program. 42 U.S.C. ch. 7, subch. IV, pt. A. The last of these contracts expired on June 30, 1978. At this time another proposed contract between plaintiff and the Indiana State Department of Public Welfare for the period from July 1, 1978, to June 30, 1979, was submitted to Sendak, as the Indiana Attorney General, for approval.

This dispute arose when Sendak refused to approve the 1978 contract between Mother Goose and the Department. On September 26, 1978, Sendak wrote a letter to the Governor of Indiana in which he stated that he refused to approve the contract because Anthony Cifaldi, President, Administrator, and a director of Mother Goose, had twice been convicted of making false statements on his income tax returns. Mother Goose filed suit in the district court on November 21, 1978, under 42 U.S.C. § 1983, alleging that Sendak's refusal to approve the contract was without sufficient legal reason and thereby deprived him of his property without due process of law.

Several Indiana statutes and regulations are directly at issue in this case. First and most critically, "[a]ll contracts and leases

---

[*] Honorable William P. Gray, Senior District Judge for the Central District of California, is sitting by designation.

[1] The record does not disclose whether Theodore Sendak has any relationship to Maurice Sendak, a popular author of children's literature. We thus think it appropriate at this point to relieve the anxieties of any reader of this case (whose caption could be appropriately abbreviated to *Mother Goose v. Sendak* ) who may think that this case is about fairy tales and make-believe; it is not.

[2] The district court's first order in this case was issued by Judge Phil McNagny, who died before the damages issues were decided. Consequently the case was assigned to Judge William Lee who issued the decision on damages and on attorney fees.

[to which the State is party] shall be approved as to form and legality by the attorney general," IND.CODE 4–13–2–14, and "[n]o contract with a state agency is legally binding until such approval has been secured." *Citizen Energy Coalition of Indiana, Inc. v. Sendak,* 459 F.Supp. 248, 256 (S.D.Ind.1978), *aff'd,* 594 F.2d 1158 (7th Cir.1979). At the time of the Attorney General's rejection of the Mother Goose contract, the Department of Public Welfare had issued a regulation pursuant to its rule-making authority, IND.CODE 12–1–2–3, which provided in part that

(a) Each member of the staff [of an approved provider] shall be a competent and reliable person of good moral character and reputation who is mentally, physically and emotionally able to assume assigned responsibility for group care of children, or for the operation and maintenance of the child-care institution.

IND.ADMIN.CODE (17–3–2–12)–B8 (currently codified at 470 IND.ADMIN.CODE 3–4–11 (1984)).

The district court, on Mother Goose's motion for summary judgment, ruled that the Attorney General knowingly acted "beyond the scope of his statutory authority and outside of the law in not accepting the contract [in that] '[h]e has a mandatory duty to approve all contracts which are lawful as to form and content.'" 502 F.Supp. at 1323. The court reasoned that the Attorney General had admitted in his deposition that he could find no facial defect in the contract, and that his only consideration in disapproving the contract was Cifaldi's prior tax conviction, which Sendak considered rendered Cifaldi lacking good moral character under Section (17–3–2–12)–B8 of the Administrative Code. *Id.* at 1321. The district court held that the Attorney General's knowledge that he was acting outside the scope of his duties removed any claim to qualified immunity that he may have had under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and awarded Mother Goose compensatory damages of $28,-248.75. 591 F.Supp. at 909. The district court also held that the action against the Attorney General was not barred by the Eleventh Amendment.

On appeal, Sendak claims that the district court committed four errors when it found him personally liable to Mother Goose: (1) that the district court erred in imposing personal liability on Sendak for allegedly misinterpreting his authority as Attorney General under an unconstrued state statute; (2) that the court erred in rejecting his defense of immunity; (3) that the Attorney General was entitled to immunity under the Eleventh Amendment; and (4) that the Mother Goose's claim was not actionable under 42 U.S.C. § 1983.

## II

■ Sendak's first and third arguments raise essentially the same claim that Sendak, acting in his official capacity as the Attorney General of Indiana, cannot be held personally liable for his actions and that consequently this action is barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." However much these fairly simple words remain the subject of continuing debate, *see, e.g., Atascadero State Hospital v. Scanlon,* —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), one construction of the amendment is clear: "the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Schueur v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). Sendak, therefore, can be held personally liable for his actions as Attorney General, provided that no other bar to liability exists.

## III

■ We thus turn to Sendak's claims of immunity from prosecution under Section

1983. He claims first that he is entitled to absolute immunity from liability under Section 1983 because his actions under Ind. Code 4–13–2–14 rejecting Mother Goose's proposed contract are quasi-judicial in nature, *Citizens Energy Coalition v. Sendak*, 594 F.2d at 1162, and therefore entitled to absolute immunity. *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978). In the alternative, he argues that he is at least entitled to qualified immunity for his action. Having thoroughly examined the facts of this case, we believe that the nature of the actions which Ind.Code 4–13–2–14 requires the Attorney General to take entitles him to absolute immunity from damages under Section 1983.

Immunities recognized at the common law stem from the recognition that public officials require some form of protection from suits for damages "to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). There are two kinds of immunity: qualified and absolute. The general rule with regard to immunities is that high government officials whose duties entail complex discretionary responsibilities are entitled only to a qualified immunity. *Id.* at 807, 102 S.Ct. at 2732. Absolute immunity, however, has been recognized "[f]or officials whose special functions or constitutional status requires complete protection from suit." *Id.* See also *Mitchell v. Forsythe*, —— U.S. ——, 105 S.Ct. 2806, 2813–14, 86 L.Ed.2d 411 (1985). "An absolute immunity defeats the suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976). Qualified immunity, while also an immunity from suit, arises from the facts of the particular case and is granted to government officials performing discretionary functions and whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S.

at 818, 102 S.Ct. at 2738. Thus we recognize that legislators in their legislative functions, *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), judges in their judicial functions, *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), prosecutors in their prosecutorial functions, *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128, and executive officials engaged in adjudicative functions, *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895, are entitled to absolute immunity. In light of these decisions, we reaffirm our conclusion in *Citizens Energy* that the Indiana Attorney General, when reviewing contracts pursuant to Ind.Code 4–13–2–14, is acting in a quasi-judicial capacity and therefore entitled to absolute immunity from liability for damages.

In each case where a government official has claimed that he is entitled to absolute immunity, we rely not upon that official's position in government, but on an examination of the nature of the functions he was performing in the case. *Butz*, 438 U.S. at 508, 98 S.Ct. at 2911. Three factors must be considered. First, we examine the historical or commonlaw basis for the immunity in question. *Id.* Second, we examine whether the functions which the official performs subject him to the same obvious risks of entanglement in vexatious litigation as is characteristic of the judicial process. *Id.* at 512, 98 S.Ct. at 2913. With this second factor we consider the possibility that losers will bring suit against the decision-makers in an effort to relitigate the underlying conflict and "charg[e] the participants in the first with unconstitutional animus." *Id.* And third, we consider whether the official is subject to checks upon abuses of authority, such as the correction of error on appeal. *Id.*

In *Citizens Energy*, 594 F.2d 1158, we affirmed a district court's construction of Ind.Code 4–13–2–14. The district court in *Citizens Energy* had to construe the authority of the Indiana Attorney General under Ind. Code 4–13–2–14. Although the

statute had been enacted for nearly forty years prior to the *Citizens Energy* case, no Indiana Court had ever ruled on the meaning of the statute. The district court concluded that "[t]he Attorney General exercises a quasi-judicial professional discretion when approving contracts pursuant to Ind. Code 4–13–2–14." But, the court went on to hold that "in determining whether to approve or disapprove state contracts, the Attorney General may only consider the legality and form of the proposed contract ... [and] has no discretion to reject a contract which is lawful as to form and content." 459 F.Supp. at 257. Because the Attorney General was exercising a quasi-judicial discretion, however, monetary damages could not be assessed against the Attorney General, but he could be enjoined from further unlawful conduct. *Id.* at 258. On appeal, this court affirmed the district court and specifically reiterated the district court's conclusion that Ind.Code 4–13–2–14 requires the Attorney General to exercise a quasi-judicial professional discretion when approving contracts.[3]

The district court in *Citizens Energy* issued a preliminary injunction against the Indiana Attorney General to prevent him from implementing his determination, made pursuant to the authority granted him by Ind.Code 4–13–2–14 to review contracts, that a proposed contract between Citizens Energy and the Public Counselor of Indiana was illegal. The Attorney General determined that because Citizens Energy maintained a paid lobbyist on its staff, Citizens Energy's role as a grant recipient from the state would essentially make the organization, and consequently its lobbyist, a public official. The Attorney General thus concluded that the proposed contract was illegal under Ind.Code 2–4–3–7, which prohibits lobbying for pay by public offi-

cials. The district court held that the Attorney General could not construe the statute to deny the proposed contract with Citizens Energy in such a way as to deprive them of their rights to petition the government under the first and fourteenth amendments. Such a restriction, the court reasoned, could not be upheld unless the state could show the existence of a compelling state interest. The court thus concluded that the Attorney General's construction of the Indiana anti-lobbying statute was not supported by a compelling state interest and issued a preliminary injunction.

With regard to the first factor of the *Butz* analysis, the historical basis for the immunity, we could find no cases which discussed the role of the Attorney General when performing functions comparable to the functions at issue here. We must also recognize that the Indiana Attorney General receives his powers and duties from statutes alone and holds no common law powers. *State ex rel. Steers v. Criminal Court of Lake County*, 232 Ind. 443, 112 N.E.2d 445 (Ind.1953). But, where the office is created by statute and "did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure." *Nixon v. Fitzgerald*, 457 U.S. 731, 738, 102 S.Ct. 2690, 2695, 73 L.Ed.2d 349 (1982). There are, for example, a plethora of cases discussing the immunity accorded to an attorney general when acting in a prosecutorial capacity and when administering the criminal laws. These cases are in agreement that the Attorney General should be shielded by an absolute immunity in such contexts. *See, e.g., Dellums v. Powell*, 660 F.2d 802 (D.C.Cir.1981); *Wilhelm v. Turner*, 431 F.2d 177 (8th Cir.1970), *cert. denied*, 401 U.S. 947, 91 S.Ct. 919, 27 L.Ed.2d

---

**3.** Our decision in *Citizens Energy* should have been enough for the district court in this case to dismiss the action against the Sendak, but it was not. Judge McNagny, after quoting this court's language that the provision requires the exercise of a quasi-judicial discretion and therefore entitles the Attorney General to immunity, stated: "This Court cannot agree with this statement." 502 F.Supp. at 1323. While we recognize that

our analysis in *Citizens Energy* was brief, *Citizens Energy* is binding precedent upon the district court in this case and should have been dispositive of the issue before us. Notwithstanding the district court's analysis in this case to the contrary, no cases decided since our decision in *Citizens Energy* give us cause to question the continued validity of the rationale behind that decision.

230 (1971); *Scolnick v. Lefkowitz*, 329 F.2d 716 (2d Cir.), *cert. denied*, 379 U.S. 825, 85 S.Ct. 49, 13 L.Ed.2d 35 (1964); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed.2d 1363 (1950); *Yaselli v. Goff*, 12 F.2d 396 (2d Cir.1926), *aff'd*, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927); *Suitor v. Nugent*, 98 R.I. 56, 199 A.2d 722 (1964). We think that these cases provide an adequate historical basis for granting the Indiana Attorney General absolute immunity in this case.

There are, of course, some obvious differences between the role of the Attorney General as prosecutor and the Indiana Attorney General's role in reviewing proposed contracts with the state for correct "form and legality." But the similarities between the two are sufficient to make them analogous for immunity purposes. In both instances the state has vested the Attorney General with the responsibility to review the facts of a given case—in one, allegedly criminal conduct, and in the other, a proposed contractual relationship—and determine whether the conduct is legal. Both decisions require that the Attorney General use his legal expertise and practical experience to determine whether the proposed conduct is in accordance with the law. In fact, in the contract review area, the Attorney General's conduct is even more "judicial" than in the Attorney General's role as prosecutor. As prosecutor, he is vested with broad discretion to bring a suit, which discretion is seldom questioned by the court, especially if the Attorney General decides not to pursue the case further. Moreover, as a prosecutor, the Attorney General in a sense is merely initiating the formal judicial process. In his role as contract reviewer, he has no discretion in determining what cases are considered formally, much as a judge has little control over which cases are prosecuted. Moreover, rather than starting the prosecution, the Attorney General is vested with the "ultimate" decision on legality.

In *Butz*, the Supreme Court was faced with the issue of the immunity, if any, which should be afforded to the Chief Hearing Examiner, Judicial Officer, and prosecuting attorney for the Department of Agriculture who issued and reviewed an administrative action against a commodities futures commission merchant. In determining that these administrative officials were to receive absolute immunity, the Supreme Court reviewed the historical rationale for the absolute immunity for judges, and concluded that "[j]udges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities," 438 U.S. at 511, 98 S.Ct. at 2913, and "from the characteristics of the judicial process." *Id.* at 512, 98 S.Ct. at 2913.

The Court next considered the special nature of the hearing examiner and the ALJ's responsibilities. The Court determined that these officials must be free to "perform their respective functions without harassment or intimidation." *Id.* Just as the judicial process contains many safeguards which place checks on malicious actions by judges—"[t]he insulation of the judge from political influence, the importance of precedent is in resolving controversies, the adversary nature of the process, and the correctability of error on appeal" *id.*—the adjudicatory process in federal administrative agencies was given immunity because the framework within which the hearing examiner and administrative law judge work is functionally comparable to the judge.

Similarly, in this case, the Attorney General is vested by the state with a special power to review contracts, subject to certain checks which limit the chances of arbitrary or malicious actions in the contract review process. Mother Goose argues that because of the seemingly narrow construction which this court placed on Ind.Code 4-13-2-14 in *Citizens Energy*, the role of the Attorney General is more in the nature of an administrator than in the nature of a judge. It is true that in *Citizens Energy* we did hold that the statute which requires the Attorney General to approve all contracts which are correct as to "form and

legality" allows him no discretion to disapprove those which are correct. But to state that it follows from this holding that the Attorney General's action in reviewing a contract is in a sense ministerial, ignores the very nature of the act which the Attorney General must perform. While a determination as to the correct "form" of the contract may be a simple task, the Attorney General's responsibility to determine the legality of contracts which state agencies wish to enter can hardly be a simple ministerial duty. One must examine more than the face of a contract to determine that it is not an illegal contract under State law.[4]

In this case, the Attorney General had the right, indeed the responsibility, to look beyond the mere words of the proposed contract. Just because the parties had had three previous contracts which were approved does not mean that the contract here had to be approved. It was certainly the prerogative of the Attorney General in this case to make the determination that because Cifaldi had twice been convicted of making false statements on his tax returns that he was not a "staff member" of "good moral character."[5]

The risk of vexatious litigation is also obvious in this case. As of September 30, 1984, the contracts section of the Indiana Attorney General's office had reviewed 6,609 documents for the calendar year. The Attorney General rejected 276 of those documents. It is inconceivable that we should open the Attorney General up to suit from nearly 300 rejected contractors a year. Such an opportunity for intimidation and harassment would inevitably diminish the impartiality of the Attorney General in reviewing proposed state contracts. *See Butz*, 438 U.S. at 516, 98 S.Ct. at 2915.

Finally, the Attorney General is subject to checks upon abuses of his authority. *Butz*, 438 U.S. at 512, 98 S.Ct. at 2913. The process by which the Attorney General must approve contracts has similar "characteristics of the judicial process." The statute provides that all proposed contracts must be approved by the Attorney General, and no contract is valid without his approval. *Citizens Energy*, 459 F.Supp. at 256. In making that determination, he must interpret Indiana statutory and case law to determine that the proposed contract does not violate any laws. Second, the Indiana General Assembly has provided checks upon the Attorney General. Indiana provides for actions in the form of mandamus. *See* IND.CODE 34-1-58-1. IND.CODE 34-1-58-2 provides:

> The action for mandate may be prosecuted against any inferior tribunal, corporation, public or corporate officer or person to compel the performance of any act which the law specifically enjoins, or any duty resulting from any office, trust or station.

The Indiana Supreme Court has held that "[t]he trial courts of this state clearly have the power to issue writs of prohibition and mandamus to administrative agencies in appropriate cases, such as where constitutional due process rights are being denied," *State* ex rel. *Pickard v. Superior Court*, 447 N.E.2d 584 (Ind.1983). And this Court has recently noted that Indiana also provides extensive declaratory relief in its state courts to individuals wishing to test the scope and legality of state laws and municipal ordinances. *See Waldron v. McAttee*, 723 F.2d 1348 (7th Cir.1983).

---

**4.** Questions regarding the "legality" of actions are those which are the everyday "work" of lawyers and judges. Thus for example, this court is called upon here to consider the "legality" of the Attorney General's actions. It can hardly be said that our task is the "ministerial" responsibility of applying intricate decisions under Section 1983 to the facts of this case.

**5.** But the correctness of that determination by the Attorney General is not at issue here because we find that Sendak cannot be subject to

an award of retrospective damages under Section 1983. If relief of another sort not barred by immunity concerns, such as an injunction, were at issue here, we would be required to examine the legality of the contract more closely, as we did in *Citizens Energy*. But although the complaint had initially sought injunctive relief, the district court did not award it and Mother Goose has not cross-appealed on the denial of the injunction.

Moreover, to the extent that Mother Goose asserts that its rights are contractual, Indiana law provides a relief mechanism of which Mother Goose has not yet availed itself. IND.CODE 34–4–16–1 provides:

> Any person or persons having or claiming to have a money demand against the state of Indiana, arising, at law or in equity, out of contract, express or implied, accruing within fifteen (15) years from the time of the commencement of this action, may bring suit against the state therefore in the superior court of Marion County, Indiana, by filing a complaint with the clerk of the said court and procuring a summons to be issued by said clerk, which summons shall be served upon the attorney-general of Indiana thirty (30) days before the return day of the summons.

The review procedures provide adequate checks upon abuse by the Attorney General to confirm our conclusion that when reviewing proposed contracts for the state, the Indiana Attorney General is performing a quasi-judicial function and his conduct thereunder is entitled to absolute immunity from prosecution for damages under Section 1983.[6]

As we established in *Citizens Energy*, the Attorney General's discretion is limited in the reasons for which he can reject a proposed contract. "The Attorney General has no discretion to reject a contract which is lawful as to form and context." 594 F.2d at 1162. Because "he is not a party to the contract," *id.*, he cannot reject those which he considers "bad" as a matter of public policy or which he thinks the state is "unwise" to enter. That is not within his authority. His role is limited to considering whether the contract is "bad" as a

matter of law, insofar as it complies with state and federal law as he interprets it. There is no question in this case that Sendak rejected the contract for "legal" reasons.

Therefore the district court's decision holding Sendak personally liable for rejecting Mother Goose's contract must be reversed.

## IV

■ Because the district court found Sendak liable for damages under Section 1983, it also awarded Mother Goose attorney fees as authorized in 42 U.S.C. § 1988. This award must obviously be vacated in light of our holding that Sendak is immune from liability. In his appeal challenging the award of attorney fees, Sendak also asks us to overrule our decision in *Terket v. Lund*, 623 F.2d 29 (7th Cir.1980). We decline to do so.

■ In *Terket* we were asked to review a district court's decision to award attorney fees to the prevailing party under Section 1988 after the non-prevailing party had filed its notice of appeal in the underlying Section 1983 action. We held that

> district courts in this circuit should proceed with attorney's fees motions, even after an appeal is filed, as expeditiously as possible. Any party dissatisfied with the court's ruling may then file an appeal and apply to this court for consolidation with the pending appeal of the merits.

623 F.2d at 34.

We find Sendak's arguments that this procedure does not serve judicial economy unpersuasive. It is true that it is necessary for the non-prevailing party to file two appeals where the fees award is made sepa-

---

6. It is true, of course, that the General Assembly has not required that the Attorney General provide any hearing to the agency or the private contractor as part of the contract approval process. It may be that due process requires some sort of pre-deprivation hearing, *see, e.g., Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), but that issue is not now before us. Mother Goose has chosen not to appeal the district court determination that injunctive relief would not be appropriate, which appeal would have given us jurisdiction to consider that broader constitutional issue. Similarly, we have no occasion here to consider whether the post-approval proceeding afford adequate protections under the due process clause. *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Our only conclusion is that for the purposes of our review of the immunities issue, the Attorney General's contract approval process is quasi-judicial in nature.

rate from the underlying action. But it is not true that the losing party is "forced into the ludicrous position of appealing fee awards they might otherwise choose not to challenge" in order not to be faced with a fee award against it if the underlying action is reversed. Appellant's br. in No. 84–2921 at 5.

It is only necessary under *Terket* for the losing party to make a timely appeal of an award under Section 1983 if that party has some basis for challenging the award or he challenges substantive aspects of the fee. If the only reason for challenging the award is to preserve his rights in case this court reverses the Section 1983 decision, Rule 60(b), FED.R.CIV.PROC., provides an appropriate remedy. Rule 60(b) provides in part that

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding [when]:
>
> \* \* \* \* \* \*
>
> (5) ... a prior judgment upon which it is based has been reversed or otherwise vacated....

We recognize, of course, that our review of trial court decisions under Rule 60(b) is for an abuse of discretion. *McKnight v. United States Steel Corp.*, 726 F.2d 333, 335, (7th Cir.1984). But, if the underlying action has been reversed, vacated or otherwise modified by this court, it would be an abuse of discretion for the trial court to leave a Section 1988 attorney fee award intact, if the Rule 60(b) motion was made within a reasonable time after our reversal of the underlying Section 1983 action.

Concerns for judicial economy warrant the continued use of the *Terket* rule. The compelling reasons for the rule are to permit fee determinations to be made while the relevant factors of the Section 1983 action are fresh in the trial judge's mind and to prevent duplicative litigation. Judicial economy is best served by the consolidation of appeals from the Section 1983 action with the related attorney fee questions. Under the *Terket* rule both the trial court and this court are each given the opportunity to consider both claims at roughly the same time.

The judgments of the district court are reversed with directions to vacate the award of damages and attorney fees and to dismiss the suit.

SO ORDERED.