**STATE of Indiana, Appellant (Plaintiff Below),**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY, Appellee (Defendant Below).**

No. 4–482A92.

Court of Appeals of Indiana, Fourth District.

May 31, 1984.

Linley E. Pearson, Atty. Gen., Mark J. Tidd, Deputy Atty. Gen., Indianapolis, for appellant.

Robert F. Zoccola, Julia M. Blackwell, Locke, Reynolds, Boyd & Weisell, Indianapolis, for appellee.

MILLER, Judge.

Plaintiff-appellant State of Indiana appeals from an adverse summary judgment rendered in its suit against defendant-appellee American Motorists Insurance Company (American) on a performance bond. By the terms of the bond, American had ensured the performance of Spectra Systems (Spectra) with regard to its sale and installation of an air quality monitoring system ordered by the State Board of Health. The State called upon American to reimburse it for payments made to Spectra after Spectra failed to make its equipment and materials fully operational within 60 days of the date of delivery, as it had promised in its contract. American denied liability and the instant litigation ensued.

American moved for summary judgment and, after holding a hearing, the trial court granted American's motion, finding (1) the underlying contract between Spectra and the State was illegal and unenforceable because it was executed without approval by the Attorney General of Indiana, allegedly in violation of IND.CODE 4-13-2-14; (2) the underlying contract between the State and Spectra had been materially altered without American's consent, thereby releasing American. The State contends genuine issues of material fact remain on these issues, making the grant of summary judgment improper. We agree and reverse.

FACTS

On June 30, 1972, the Indiana State Board of Health submitted a requisition to the Indiana Department of Administration for the purchase of equipment and materials for an air quality monitoring system. According to the design for the project, the system would be housed in two instrument trailers located in the cities of Indianapolis and Hammond respectively. It would collect air pollution concentrations and other meteorological data, record the same on magnetic tape and transmit the stored data to a central station. The Supply Division of the Indiana State Department of Administration sent out invitations to bid on the system and thereafter accepted a low bid ($190,356.00) submitted by Spectra Systems, a California corporation. A purchase order was accepted by Spectra April 17, 1973, which order required all the equipment purchased to be fully operational and in complete compliance with specifications within 60 days of the initial delivery, which

was to occur within six months of the issue of the purchase order on March 7, 1973. The contract also included a facilities management contract whereby Spectra agreed to maintain and service the system for a period of one year following delivery.

Problems arose with the contract shortly after its conception, however. Apparently, the Board of Health had originally agreed to forward partial payments to Spectra in California as work progressed on the system. However, after consultation with the Attorney General's office, the Board discovered such prepayment would be illegal. The Board then informed Spectra that in order for money to be released before completion of the system, parts of the system would have to be shipped piecemeal rather than as a single unit as originally planned. According to Spectra, this arrangement for partial shipments thwarted its plans for testing the major systems elements and greatly increased its costs for the project, eventually causing it to become insolvent and to shut down its operations altogether. While all pieces of the equipment required by the contract were eventually delivered to the specified sites, the system never became fully operational nor did it meet the contract specifications as to collection of valid data.

The State sued both Spectra and American, which, as previously mentioned, had issued a bond insuring Spectra's performance. American answered in general denial[1] and filed a cross-claim against Spectra, as well as a third-party claim against certain individuals related to the company, seeking indemnity for any losses it might incur as a result of the lawsuit.

Discovery ensued, after which American moved for summary judgment claiming: (1) the contract between Spectra and the State was illegal and void because it was not in compliance with statutes regarding the award of State contracts; (2) the contract was materially altered (a) by the State's

partial payments to Spectra prior to the physical delivery and installation of the equipment on site; (b) by the State's extension of the delivery schedule and operation dates,[2] which alterations were made without notifying American or obtaining its consent thereto. The motion for summary judgment was neither verified nor supported by affidavits or other evidentiary material as contemplated by Ind.Rules of Procedure, Trial Rule 56. The only attachments were unverified photocopies of correspondence between Ralph Pickard, Technical Secretary of the Indiana Board of Health and Theodore Sendak, former Indiana Attorney General.

The trial court scheduled and apparently held a hearing on the matter. Thereafter, it granted summary judgment for American and entered the following findings of fact and conclusions of law:

### "FINDINGS OF FACT

1. On April 17, 1973, the Indiana State Board of Health (hereinafter 'Board') contracted with Spectra Systems, a Division of Spectra General Corporation (hereinafter 'Spectra'), for the purchase and installation of an air-quality monitoring system.

2. On April 30, 1973, American Motorists Insurance Company (hereinafter 'American') issued a performance bond No. 3SM163 132, under the terms of which it became bound to the obligee, State of Indiana, in the sum of One Hundred Ninety Thousand Three Hundred Fifty-Six Dollars ($190,356) as surety for Spectra's performance under the contract.

3. Under the terms of the purchase order, the air-quality monitoring system was to be delivered within six (6) months of the day the purchase order was issued and was to be fully operational within sixty (60) days thereafter.

---

**1.** No affirmative defenses were pled (i.e. illegality, estoppel).

**2.** American's allegations regarding the extensions of time were not included in its original

motion for summary judgment, but were contained in a subsequent reply brief filed in response to the State's brief opposing summary judgment.

4. The purchase order was issued on March 7, 1973 and accepted by Spectra on April 17, 1973.

5. By letter dated August 17, 1973, addressed to Ralph C. Pickard, Technical Secretary of the Air Pollution Control Board, the Attorney General of Indiana, speaking for the State of Indiana, stated that the contract between the State and Spectra was illegal based on the following grounds:

'The laws of Indiana specify public bidding procedure and the submission of contracts of successful bidders to the office of Attorney General for his approval as to legality and form in conformance with those laws. We have no knowledge that this was ever done with respect to the transaction you describe; therefore, it is *illegal*.' (Burns' Ind.Stat., 53–104 to 53–110, 53–123 to 53–133, 53–135, 53–136, 60–1822).

6. By letters dated January 7, 1974, April 23, 1974, September 30, 1974 and November 27, 1974, the State extended the dates of delivery and operation of the system beyond the date set forth in the contract by and between the State and Spectra.

7. Each extension was made without prior notice having been given to American.

8. On December 14, 1976, the State filed suit against Spectra and American alleging that Spectra had refused to perform and had defaulted on its contract with the State and alleges that American was thereby indebted to the State for the full amount of its bond as a result of such default.

## CONCLUSIONS OF LAW

1. The contract by and between the State and Spectra was made in violation of a statute as stated by the Attorney General in his letter of August 17, 1973, and thus is illegal and void. As such, the contract will not be enforced.

2. A surety is discharged when the liability of its principal is extinguished. Given that the contract may not be enforced against Spectra, Spectra's liability to the State is extinguished and American is discharged from liability to the State under its bond.

3. A binding change in the principals' contract, to which the surety does not consent, will discharge the surety from liability under its bond as well. Having been given no prior notice of the changes made in the contract, American is discharged from liability to the State under its bond.

4. The law is with the defendant American Motorists Insurance Company and against the plaintiff, the State of Indiana.

5. There being no genuine issues as to any material fact, and defendant American Motorists Insurance Company being entitled to a final judgment as a matter of law, and there being no just reason for delay, defendant American Motorists Insurance Company is entitled to final judgment and for its costs."

(R. 628–31)

## DECISION

At issue is whether the trial court erred in granting American's motion for summary judgment. The State asserts judgment in American's favor was improper, urging that genuine issues of material fact remain in the controversy and that the trial court improperly applied the law to the facts. American, on the other hand, defends the trial court action and urges that illegalities and alterations in the principal contract relieved it of responsibility.

 We preface our discussion of the arguments regarding the legality of the underlying contract and the legal effect of the alterations made thereto with a recitation of the applicable standard of review. First we note that generally, summary judgment is proper only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Ind.Rules of Procedure, Trial Rule 56(C). The party seeking summary judgment has the burden of proving

there are no material facts in controversy, and the evidence before the court must be construed in a light most favorable to the nonmoving party. Even if the facts are not in dispute, summary judgment is inappropriate when the evidence before the court reveals a good faith dispute as to the inferences to be drawn from those facts. *Vanco v. Sportsmax, Inc.*, (1983) Ind.App., 448 N.E.2d 1198. Our appellate standard of review is the same as that utilized by the trial court: that is, we must determine whether the moving party is entitled to judgment as a matter of law. *Number One Beverage, Inc. v. Miller Brewing Co.*, (1982) Ind.App., 437 N.E.2d 508.

*Illegality of the Principal Contract*

In granting summary judgment, the trial court concluded the principal contract between the State and Spectra was violative of statute and therefore illegal. Apparently, this conclusion was principally based upon an August 17, 1973 letter written by Theodore Sendak, then Indiana Attorney General, to Ralph Pickard, Technical Secretary of the Indiana Board of Health, a copy of which letter was attached to American's motion for summary judgment. Pickard had written Sendak regarding a request for partial payment on the system. Sendak responded as follows:

"August 17, 1973

Mr. Ralph C. Pickard
Technical Secretary
Room A–407, Board of Health Bldg.
1330 West Michigan Street
Indianapolis, Indiana 46206
Dear Mr. Pickard:

This will acknowledge receipt of your letter dated August 6, 1973 containing your request for our approval of the payment of State money to a contractor, namely, Spectra Systems, for the purchase of equipment.

The laws of Indiana specify public bidding procedure and the submission of contracts of successful bidders to the office of Attorney General for his ap-

proval as to legality and form in conformance with those laws. We have no knowledge that this was ever done with respect to the transaction you describe; therefore it is *illegal.* (Burns' Ind.Stat. 53–104 to 53–110, 53–123 to 53–133, 53–135, 53–136, 60–1822.)

In answer to your other questions as to advance payments, that is *specifically prohibited by the laws of Indiana.* (Burns' Ind.Stat. 60–1822.)

Yours truly,
s/s
THEODORE L. SENDAK
Attorney General of Indiana"

(R. 441) (Emphasis in original.)

The State opposed the motion for summary judgment, asserting IND.CODE 5–16–1–1 to –3 and 5–16–2–1 and –3,[3] which were among those statutory provisions cited by American in its motion (and referred to by Sendak in his letter) were inapplicable to the controversy at bar inasmuch as they applied to contracts involving "public buildings, work or improvement," and the instant contract dealt with the purchase of equipment, which was governed by IND. CODE 4–13–3–1 to –10[4] relating to the purchase of "supplies, material, furniture, furnishing and office equipment." It further claimed that the State had complied with all applicable statutes and rules with the exception of IND.CODE 4–13–2–14 (Burns 1969), which required all State contracts and leases to be approved as to form and legality by the Attorney General. In connection with this latter claim, the State filed the affidavit of Raymond E. Sanders, Commissioner of the Indiana Department of Administration, who averred he was familiar with the Spectra contract and that it had "resulted from the proper bidding procedures implemented by the Supply Division of the Indiana Department of Administration on behalf of the Indiana State Board of Health." (R. 504)

Despite the State's protestations, however, the trial court concluded: "[t]he con-

---

**3.** Formerly Burns Ind.Stat.Ann. 53–103 to –110.

**4.** Formerly Burns Ind.Stat.Ann. 60–617 to –627.

tract by and between the State and Spectra was made in violation of a statute as stated by the Attorney General in his letter of August 17, 1973 and thus is illegal and void." Thus, we note that although the trial judge made a finding of illegality, he made no specific finding as to the particular legal infirmity upon which he based its conclusion.

While a narrower finding would have aided our review of this issue, we can make the following observations from the facts before us. First, we note that although the cited portion of the Sendak letter alludes to a number of statutory provisions, its only reference to a specific violation of any of these statutes concerns the State's failure to obtain Attorney General approval, as required by IC 4–13–2–14. Further, we observe that while American argued several statutory provisions were violated, it introduced no affidavits or other evidentiary materials establishing facts which would constitute a violation of any of the statutory provisions cited in the Sendak letter. Indeed, the record before us is bare as to facts which would support a finding that any statutes regarding the letting of public contracts were violated, with the exception of IC 4–13–2–14, non-compliance with which was admitted by the State.

For the purposes of reviewing the summary judgment then, we look to the legal effect the violation of IC 4–13–2–14 had on the suretyship agreement herein. We conclude that its violation was not of a nature to void the primary contract and thereby discharge American's obligation.

The version of IC 4–13–2–14 in effect at the time of the Spectra contract instructed:

"All contracts and leases shall be approved as to form and legality by the attorney-general. A copy of every such contract or lease extending for a term longer than one [1] year shall be filed with the director of public works and supply."

(Burns 1969). American urges that when the State failed to obtain the attorney-general's approval to the primary contract, the agreement was tainted with illegality and thereby rendered void. Citing Indiana case law for the proposition that no action can be based on an illegal contract, American contends its liability under the performance bond was discharged by the illegality. Without having to address the possibility of illegality,[5] there is another separate rea-

---

5. We recognize there is authority, as urged by the State, to the effect that the illegality involved here would not create a void contract. First, as the State correctly points out, there is no specific penalty provision appended to IC 4–13–2–14 voiding contracts which do not have Attorney General approval. *Compare* IND.CODE 5–16–2–2 (which specifically states that all contracts for public works not let in conformance with IND.CODE 5–16–1–1 *et seq.* shall be void.) Second, we note that the Attorney General has no discretion to reject a contract which is lawful as to form and content, but instead has a mandatory duty to approve such an agreement. *Citizens Energy Coalition of Indiana, Inc. v. Sendak,* (S.D.Ind.1978) 459 F.Supp. 248. American has produced no case voiding a public contract because the State failed to obtain Attorney General approval nor any evidence to indicate approval would not have been forthcoming under the instant facts. *Compare* IC 4–13–2–14 (current version provides automatic approval by failure to specifically disapprove within 90 days).

A number of jurisdictions, including Indiana, have held that statutes requiring public bonds be approved are directory in nature and do not affect the liability of the surety on the bond. In *Eastburn v. Board of Finance of Town of Lake-*

*ville,* (1935) 100 Ind.App. 310, 195 N.E. 581, this court cited with approval the following legal principle:

"*As a general rule* it appears that statutes providing that the bond or sureties shall be approved, and limiting the time in which it may be done, are directory merely, being for the convenience, security, and protection of the public, and not directly for the benefit of the principal in the bond and his sureties. Hence, if a bond is delivered for approval, it becomes a binding obligation, unless actually disapproved, and a dereliction of duty on the part of officers appointed by law to pass on the sufficiency of the security, and approve or reject it, cannot be taken advantage of by the bondsmen. If such officers fail to act in the manner or time prescribed, or if they fail to act at all, or if the wrong officers act, the sureties are, nevertheless, bound." (Emphasis in original.)

195 N.E. at 582, *quoting* 21 R.C.L. 973. *See also Estate of Ramsay v. People,* (1902) 197 Ill. 572, 64 N.E. 549; *Linz v. Eastland, County,* (1931) Tex.Comm.App., 39 S.W.2d 599; *American Surety Co. v. Commonwealth,* (1942) 180 Va. 97, 21 S.E.2d 748. We also find support for our posi-

son for countering American's summary judgment.

██ Suretyship law instructs that "where the non-enforcement of the illegal contract would penalize those intended to be protected by the statute, the surety may not plead the defense." Simpson, *Handbook on the Law of Suretyship* 284 (1950). Here, there is little question the statute now being invoked by American to avoid paying under its performance bond was designed not to protect the surety, but rather to safeguard the public treasury. Thus, under the instant facts, denying recovery to the State based on the fact that the Spectra contract was not approved by the Attorney General would run counter to the purposes for which the law requiring Attorney General approval was enacted in the first place—to protect public funds. Our courts have long held to the equitable maxim that "the law ceases with the reason thereof." *Deming v. State,* (1864) 23 Ind. 416, 420.

In reaching our result, we recognize the rather firm stand our courts have taken against the enforcement of public contracts requiring the *expenditure* of public funds when the contracts were not entered into according to law. *Mazac v. City of Michigan City,* (1934) 98 Ind.App. 366, 189 N.E. 400 (contract for garbage collection not submitted to city council as required by law—payment refused); *Hamer v. City of Huntington,* (1939) 215 Ind. 594, 21 N.E.2d 407, (payment for fire truck refused because funds for its purchase not appropriated before the contract was executed). Thus, "the general rule in Indiana is that the public, whether it be a state or local governmental body, cannot be estopped by the unlawful acts of public officials." *Cablevision of Chicago v. Colby Cable Corp.,* (1981) Ind.App., 417 N.E.2d 348, 354, *trans. denied.*

Had this case been one where Spectra was seeking the payment of public funds for materials furnished pursuant to a con-

tract which was not approved by the Attorney General, there would be some merit to the argument, as per *Mazac* and *Hamer,* that the agreement was not enforceable. However, such is not the case here. This is not an action seeking the unauthorized payment of public funds which would result in harm to the public and the granting of which would destroy the effect of a statute designed to protect the public treasury. *See, i.e., Gaddis v. Barton School Township of Gibson County,* (1929) 89 Ind.App. 369, 164 N.E. 499. Rather, this is an action to recover monies already expended. In many respects, the facts presented in this case are analogous to those in *Cablevision.* In that case, plaintiff, a cable television service, brought suit in 1980 challenging the validity of a cable television franchise granted by the City of Hammond to another cable company in 1971. The other cable company had, since 1971, expended money in preparation of the system. The trial court, in holding the plaintiff cable company was not entitled to enjoin installation under the earlier franchise, concluded the plaintiff might be subject to the defenses of estoppel and laches noting (1) the situation did not involve the unauthorized expenditure of taxpayers' money, (2) the limitations on government authority in the area of cable television regulation were not clear or unambiguous in 1971 so as to preclude estoppel as a matter of law, and (3) as the most compelling reason, the equitable defenses of estoppel and laches would, under the facts of the case, be consistent with the public interest. Likewise here, American is seeking to declare a contract between Spectra and the State void. No future expenditure of public funds is involved, but rather the refund of monies already paid. The denial of the surety's right to assert the invalidity of the instant contract is consistent with the public interest.

*Alterations to the Contract Between Spectra and the State*

In granting summary judgment to American, the court found that "by letters of

tion in those cases instructing that a surety can be held liable on a bond even though the underlying transaction is *ultra vires* as to the public

or private corporate principal. *See* 74 Am. Jur.2d Suretyship § 111; 72 C.J.S. *Principal and Surety* § 22 and cases cited therein.

January 7, 1974, April 23, 1974, September 30, 1974 and November 27, 1974, the State extended the dates of delivery and operation of the system beyond the date set forth in the contract by and between the State and Spectra," (R. 630) and concluded that American, having been given no notice of the charges made in the contract, was thereby discharged from its liability under the bond.[6] The State assails the court's finding and conclusion contending genuine issues of material fact remain as to whether: (1) the State extended the date, (2) American gave its prior consent to any changes, and (3) American ratified the agreement as altered.

First, the State argues the letters of January 7, April 23, and September 30, 1974, were not extensions but merely notices of default[7] and contends the fourth letter, dated November 27, 1974, is as susceptible of interpretation as a notice of default as an extension. Alternatively, the State contends that even if the November 27 letter were to be construed as offering an extension of the time of performance in exchange for Spectra's compliance with certain conditions, the author of the letter, Ralph Miles, had no authority to bind the State to any such contract extension. The State further asserts on the date of the Miles' letter, it sent American a letter containing essentially the same notice of default,[8] and points out while American asserted in its reply brief that it was unaware of the purported alterations, it offered no affidavits or other direct evidence to support this claim.

In support of its argument regarding prior consent, the State points to Paragraph 15 of the purchase order for the system, which stated:

"15 CHANGES: The State of Indiana shall have the right to make, from time to time and without notice to any sureties or assignees, changes as to packing, testing destination, specifications, designs and delivery schedule."

(R. 508)

Finally, the State argues that a March 7, 1975, letter received by Harry D. Williams, director of the Air Pollution Control Division, from A.F. Barker, an American agent, supports an inference that American, with full knowledge of prior delays and extensions, indicated a continued willingness to honor the bond and thereby ratified any changes in the principal contract. The letter (omitting formal parts) stated:

"Mr. Williams, we have not been insensitive to the problems you have had with Spectra Systems. Also, we have carefully read all the correspondence.

Claims are not unusual in the bond business, but in the case we are very gratified with Spectra Systems cooperative attitude in attempting to work this out directly with you. We are certain they will work out the problems to your satisfaction. In the event they do not, you do have a bond and we will respond."

(R. 502)

Generally, a surety is entitled to stand on the strict letter of the contract

6. In American's motion for summary judgment, the gravamen of its argument was that the contract had been materially altered by the State's partial payments to Spectra prior to physical delivery and installation of the system on site. The State responded to this claim by pointing out that money had not been advanced, but that payments had been forwarded only as each system element was delivered. This response was accompanied by an affidavit from Ralph C. Pickard, Technical Secretary of the Air Pollution Control Board, which averred that he had no knowledge of any partial or advance payments being made to Spectra prior to the physical delivery of the equipment.

American then changed its argument regarding alterations to add the allegation relating to extensions of delivery and operation dates. The trial court made no findings regarding the partial payments; neither does American make any argument regarding the issue on appeal. We therefore center our review and discussion on the reason offered by the trial court as grounds for its decision.

7. Our examination of the record discloses that the letters of January 7, April 23 and September 30, although the subject of argument, were never introduced as exhibits and were not contained in the record before the trial court.

8. This letter to American is also not included in the record before us.

upon which he is liable. *First Federal Savings & Loan Association of Gary v. Arena,* (1980) Ind.App., 406 N.E.2d 1279. When the parties to the primary contract materially alter its terms without the knowledge or consent of the surety, the surety is released, regardless of whether the change is to its injury or benefit. *American States Insurance Co. v. Floyd I. Staub, Inc.,* (1977) 175 Ind.App. 244, 370 N.E.2d 989, *trans. den.* However, it is also well established that surety may be bound where there is a basis for implications that he consented to alterations to the principal contract, whether such consent is given before or after the changes are made. Arant, *Handbook of the Law of Suretyship and Guaranty* (1931); Stearns, *The Law of Suretyship* (5th ed. 1951), *see Williams v. Boyd,* (1881) 75 Ind. 286; *Owens v. Tague,* (1891) 3 Ind.App. 245, 29 N.E. 784.

██ Here, we are not required to determine if the four letters were contract extensions inasmuch as the evidence presented by the State reveals facts from which a trier of fact might reasonably infer American either gave its prior consent to any changes or ratified any alterations once made, or both. As we noted previously, the contract clause relied on by the State gives the primary parties the right to change contract specifications and delivery dates without notice to the surety. This could be viewed as American's express advance consent to extensions of delivery and operation dates. Further, the language of the March 7, 1975 letter offered by the State supports an inference that American, well aware of the delays in the project, thereafter indicated it considered its relation of surety still existed. Viewed most favorably to the State, the non-moving party, the letter could be interpreted as a new promise to pay, thereby continuing American's liability. *See Owens v. Tague, supra.*

Reversed and remanded with direction that the summary judgment be set aside.

CONOVER, P.J., and YOUNG, J., concur.