**Cathy BURNS, Plaintiff–Appellant,**

v.

**Rick REED, Defendant–Appellee.**

**No. 88–3397.**

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1989.

Decided Feb. 6, 1990.

Michael K. Sutherlin (argued), Indianapolis, Ind., for plaintiff-appellant.

David A. Nowak, Dist. Atty. Gen. (argued), Indianapolis, Ind., Thomas H. Neuckranz, Williams & Montgomery, Chicago, Ill., William G. Bruns, Cannon & Bruns, Muncie, Ind., Edwin L. Gagnon, Byrum, Gagnon & Diehl, Indianapolis, Ind., for defendant-appellee.

Before BAUER, Chief Judge, CUMMINGS, and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

The present appeal is from the district court's order granting defendant's motion for a directed verdict in this action for damages under 42 U.S.C. § 1983. After hearing plaintiff's evidence, the district court determined that defendant, the Chief Deputy Prosecutor for Delaware County, Indiana, was absolutely immune from suit for the allegations testified to at trial. The question before the court is whether a state prosecutor is absolutely immune from suit under § 1983 for his acts of giving legal advice to two police officers about their proposed investigative conduct, and for eliciting misleading testimony from one of the officers in a subsequent probable cause hearing.

## I. BACKGROUND

Muncie, Indiana police officers Paul Cox and Donald Scroggins were assigned to investigate a September 2, 1982, incident in which an unknown assailant entered Cathy Burns' home and rendered her unconscious by striking her with a blunt object. The intruder then shot Burns' sons Eddie Griffin and Denny Sells two times apiece while they slept. Before leaving, the assailant used a lipstick to scrawl the following message on Burns' bathroom mirror: "I took what you loved most." When Burns regained consciousness, she called the police in a hysterical state and reported the incident. She and her sons were subsequently taken to a local hospital and treated for their wounds.

After conducting an initial investigation of the incident, Officers Cox and Scroggins concluded that Burns was their prime suspect. They questioned Burns on numerous occasions after the incident, but she repeatedly denied shooting her sons. The officers asked Burns to submit to a polygraph examination. She did so, and the examination results supported her claims of innocence. Unpersuaded, Cox and Scroggins asked Burns to submit handwriting exemplars; these were also exculpatory. After conducting a voice stress test with negative results, the officers reached the only conclusion that would save their theory of the case: Burns was a multiple personality.

On September 21, 1982, the officers questioned Burns once more. This time, they persuaded her to submit to questioning under hypnosis as the only way to flesh out any further evidence concerning the incident. Before proceeding, Officer Cox reminded Scroggins that during their police academy training, it was stressed that the use of hypnosis on criminal suspects or defendants was an unacceptable investigative technique. Cox's recollection prompted the officers to call Chief Deputy Prosecutor Richard Reed, the police liaison attorney, to inquire about the propriety of placing Burns under hypnosis and questioning her. That afternoon, Scroggins called Reed at his home and informed him of their desire to hypnotize Burns because she was the only one who could provide them with "additional information" about the incident. Scroggins testified that he informed Reed that Burns was their prime suspect in the shooting. Nonetheless, Reed told the officers that if hypnotizing Burns was their only remaining avenue, they should proceed.

With the assistance of an employee at a local supermarket chain, the officers hypnotized Burns and questioned her about the incident. During the video taped questioning, Burns described her assailant as someone wearing overalls, a halloween mask, and a dark wig. She also referred to the assailant as "Katie." After further questioning by the officers, Burns also made reference to herself as "Katie." The officers interpreted this response as evidence supporting their split personality theory and as a "confession" by Burns' other "self." When Burns was taken out of the hypnotic state, she reiterated her assertion that she had nothing to do with the shooting of her sons.

Soon after the hypnotic session, Officers Cox and Scroggins met with Reed at the station to ask his opinion about whether they had probable cause to arrest Burns. Reed stated that he thought they did. On the following day, Reed appeared at a probable cause hearing before a county court judge to obtain a warrant to search Burns' house and automobile. During that hearing, Reed elicited testimony from Officer Scroggins regarding Burns' alleged confession. At no point in the hearing did Reed ask Scroggins to clarify that Burns' alleged confession was in fact his interpretation of her hypnotically induced statements about "Katie." On the basis of Scroggins' misleading testimony, the judge found that there was probable cause to issue a search warrant. Burns' house and car were subsequently searched for items relating to the shooting.

On September 28, 1982, the judge issued a warrant for Burns' arrest after Jack L. Stonebraker, an investigator for the office of the Delaware County Prosecuting Attorney, submitted an affidavit in support of probable cause. Again, the judge was not informed that the alleged confession was obtained while Burns was under hypnosis. After the judge issued the warrant, Burns was arrested for attempted murder and was detained in the psychiatric ward of Ball Memorial Hospital for four months.[1] During that time, Burns was observed and tested by several medical experts who concluded that she did not suffer from a multiple personality. For example, the doctor who was asked to examine Burns to deter-

---

1. While Burns was detained, the state sought to obtain custody of her two sons based upon her alleged "confession." Burns was also discharged from her employment as a radio dispatcher for the Muncie Police Department.

mine her mental competency to stand trial offered the following conclusion:

I do not find sufficient criteria to make a diagnosis of multiple personality. There are no episodes of depersonalization nor abrupt changes in personality. There were no homicidal ideation or inappropriate interactions with staff or family members. She is able to handle the stress of being on a psychotic unit as well as a fear of losing custody of her children and her employment with maturity. I doubt very much that Cathy shot her children. Dr. Phillip Coons of LaRue Carter Hospital in Indianapolis provided psychiatric consultation. Dr. Coons has had extensive training and experience with multiple personalities. It is of interest to note that he concurs that this patient does not have a multiple personality.

Prior to Burns' trial, the court granted her motion to quash the statements she made to Officers Scroggins and Cox while under hypnosis. In the face of this development, the prosecutor's office dismissed all pending criminal charges against Burns. Nevertheless, Reed allegedly stated to the press that he thought Burns was in fact guilty of the crimes that had been charged.

At the conclusion of the foregoing ordeal, Burns filed the present § 1983 suit in federal court against Officers Cox and Scroggins, Chief Deputy Prosecutor Reed, Investigator Stonebraker, as well as numerous other Muncie Police officials. Burns alleged, among other things, that the defendants violated her constitutional rights under the color of law. Each of the defendants moved for summary judgment, claiming that they were immune from suit. The district court denied the qualified immunity defenses of Cox and Scroggins because it found that their actions may well have violated Burns' clearly established constitutional rights. The court also de-

nied Reed's claim of absolute immunity for his activities because Reed could not recall the vital facts regarding his role in the decisions to hypnotize Burns, to seek a search warrant, and to obtain a warrant for her arrest. Therefore, the court was unable to determine whether Reed was acting within the scope of his prosecutorial duties. Accordingly, it concluded that there were genuine issues of material fact which precluded summary judgment on Reed's behalf. Finally, the court found that investigator Stonebraker was neither absolutely nor qualifiedly immune from suit for submitting a knowingly false affidavit to the judge at the probable cause hearing.

Prior to trial, Officers Cox and Scroggins made a combined offer of judgment to Burns in the amount of $150,000. Stonebraker, in turn, made an offer of judgment in the amount of $100,000. Burns accepted these offers and proceeded to trial against Reed. Upon the close of Burns' case in chief, Reed moved for a directed verdict pursuant to Fed.R.Civ.P. 50. The parties briefed the motion and on November 8, 1988, the trial court entered a directed verdict in favor of defendant. The court found that Reed's act of giving legal advice to officers Cox and Scroggins and his appearance before the judge to seek the search and arrest warrants constituted conduct for which Reed was absolutely immune from suit. Burns timely filed the present appeal.

## II. ANALYSIS

◼ Burns' central claim on appeal is that the district court committed reversible error when it determined that Reed was absolutely immune from suit for both the act of advising the officers that they should proceed to hypnotize her and for his act of eliciting false testimony during the probable cause hearings.[2] She contends

**2.** Appellant also claims that the trial court applied an improper standard when it granted defendant's motion for a directed verdict because she presented a prima facie case against defendant. *See Hampton v. Hanrahan,* 600 F.2d 600, 607–08 (7th Cir.1979). This argument misapprehends the basis for the district court's

directed verdict in the present case. The determination of whether a prosecutor was acting within his or her quasi-judicial capacity and thus absolutely immune from suit is a legal question. If properly raised by the defendant, it is a matter to be decided by the trial court in light of the particular facts of the case regarding

that Reed's acts do not enjoy absolute immunity because they fall outside the scope of his prosecutorial duties since his conduct related to the investigation of her case. In light of this Circuit's interpretation of the Supreme Court's decision in *Imbler v. Patchman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), we conclude that the district court properly granted the defendant's motion.

■■ In *Imbler*, the Court held that a prosecutor enjoys absolute immunity from suits for damages under 42 U.S.C. § 1983 when he or she acts toward "initiating a prosecution and in presenting the state's case." *Id.* at 431, 96 S.Ct. at 996. After reviewing the basis for a prosecutor's absolute immunity from a malicious prosecution suits at common law—that is, the functional comparability between the discretionary judgments of a prosecutor regarding evidence and that of a judge deciding a case—the Court determined that "the same considerations of public policy that underlie the common-law rule likewise countenance absolute immunity under § 1983." *Id.* at 424, 96 S.Ct. at 992. One of the Court's central considerations was that if only qualified immunity were extended to the discretionary acts of a prosecutor, he or she would be open to suits that would undermine the performance of his or her responsibilities by diverting the prosecutor's energy and attention "away from the pressing duty of enforcing the criminal law." *Id.* at 425, 96 S.Ct. at 992. The upshot would be that:

> public trust of the prosecutor's office would suffer if he [or she] were constrained in making every decision by the consequences in terms of his [or her] own potential liability in a suit for damages. Such suits could be expected with some frequency, .... Defending these decisions, often years after they were made, could impose unique and intol-

erable burdens upon a prosecutor responsible annually for hundreds of indictments and trials.

*Id.* at 424–25, 96 S.Ct. at 992–93. Finally, the Court reasoned that if prosecutors approached their law enforcement duties ever fearful of their potential liability, the criminal justice system as a whole would be impaired. *Id.* at 426–27, 96 S.Ct. at 993–94.

In determining that a prosecutor's absolute immunity at common law applies to suits under § 1983, the Court explicitly reserved the question of whether absolute immunity also extends to "those aspects of the prosecutor's responsibility that cast him [or her] in the role of an administrator or investigative officer rather than an advocate." *Id.* at 430–31, 96 S.Ct. at 994–95. Moreover, the Court fully recognized that under its functional test, the sundry duties of a prosecutor would not always be easy to pigeon-hole:

> We recognize that the duties of the prosecutor in his [or her] role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his [or her] duty as such, to make decisions on a wide variety of sensitive issues. These include questions whether to present a case to the grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing the proper lines be-

---

the actual conduct of the defendant. *Rakovich v. Wade*, 850 F.2d 1180, 1201 (7th Cir.1988) (en banc) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)). The district court granted Reed's motion for a directed verdict only after hearing the entirety of plaintiff's evidence against him and

determining that Reed's alleged conduct fell within the ambit of his quasi-judicial functions as a prosecutor. The district court's reasoning makes it clear that it was applying the proper standard for a directed verdict in the context of an absolute immunity claim. *Rakovich*, 850 F.2d at 1204.

tween these functions may present difficult questions....

*Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33.

The Court's functional test for determining the reach of a prosecutor's absolute immunity has engendered a case-by-case approach to the question. *See Marx v. Gumbinner,* 855 F.2d 783, 789 (11th Cir. 1988) ("the dividing line is amorphous, and the process of determining on which side of the line particular kinds of conduct fall has proceeded on a case-by-case basis").[3] In this circuit, which has visited the issue on a number of occasions, the functional test has been applied broadly in instances where state officials are required or called upon to render legal opinions or advice. For example, in *Mother Goose Nursery Schools, Inc. v. Sendak,* 770 F.2d 668, 671 (7th Cir.1985), we reaffirmed that the Indiana Attorney General acts in a quasi-judicial capacity when reviewing the legality and form of state contracts pursuant to state statute. *Id.* at 671 (reaffirming *Citizen Energy Coalition of Indiana, Inc. v. Sendak,* 594 F.2d 1158 (7th Cir.1979)). With reference to the Attorney General's determination of the legality of a contract, we likened this duty to "the everyday 'work' of lawyers and judges," and found it distinguishable from mere ministerial tasks. *Id.* at 674 n. 4. Upon applying the factors enumerated in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), for determining whether official conduct enjoys absolute immunity,[4] we concluded that the Indiana Attorney General is absolutely immune from suit under § 1983 when making such legal determinations. *Mother Goose* at 671–75.

In *Henderson v. Lopez,* 790 F.2d 44 (7th Cir.1986), we drew upon our analysis in *Mother Goose* to determine whether an Illinois state's attorney is absolutely immune from suit when giving advice to a county sheriff about whether to detain an individual on contempt charges. Upon reviewing the factors delineated in *Butz,* we concluded that an assistant state's attorney functions in a quasi-judicial role when providing such legal advice to county officials. Accordingly, we held that a state's attorney is absolutely immune from suit under § 1983 for the consequences of his or her legal advice. *Id.* at 47.

A number of other circuits have reached similar conclusions by applying the Supreme Court's functional analysis in *Imbler.* In *Marx v. Gumbinner,* 855 F.2d at 790, for example, the Eleventh Circuit held that a prosecutor rendering legal advice to police officers regarding the existence of probable cause to make an arrest is absolutely immune from suit. The court reasoned that a prosecutor's legal determination regarding the existence of probable cause is part and parcel of the larger process of determining whether to initiate a prosecution. The *Marx* Court thus con-

---

3. Ironically, the case-by-case approach engendered by the Court's functional test may well undercut, in part, the rationale supporting absolute immunity. As the Court noted in *Imbler,* "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13, 96 S.Ct. at 989 n. 13. The rationale, of course, is to avoid the personal, institutional and social cost associated with such suits. *See e.g. Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (highlighting the personal and social costs of suits against public officials). However, since the conduct, for example, of a prosecutor in initiating a case as opposed to conducting investigative activities is not altogether clear and can be arguably placed on either side of the prosecution/investigation line, cases involving such claims often proceed to the federal appellate courts for resolution. *See e.g. Marx,* 855 F.2d at 789 n. 10 (citing cases).

4. We determined that the Supreme Court's decision in *Butz v. Economou* required consideration of three factors:

> First, we examine the historical or common-law basis for the immunity in question. Second, we examine whether the functions which the official performs subjects him to the same obvious risks of entanglement in vexatious litigation as is characteristic of the judicial process. With this second factor we consider the possibility that losers will bring suit against the decision-makers in an effort to retaliate the underlying conflict and 'charg[e] the participants in the first with unconstitutional animus.' And third, we consider whether the official is subject to checks upon abuses of authority, such as the correction of error on appeal.

*Mother Goose,* 770 F.2d at 671 (citations to *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913, omitted).

cluded that a prosecutor's act of rendering legal advice about an arrest was within the ambit of prosecutorial activity covered by the Supreme Court's decision in *Imbler. Id.* at 790–91. Similarly, in *Myers v. Morris*, 810 F.2d 1437 (8th Cir.) *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), the Eighth Circuit held that a prosecutor is absolutely immune from suit when he or she provides "advice of law to enforcement officials concerning the existence of probable cause and the prospective legality of the arrest." *See also Thomas v. Riddle*, 673 F.Supp. 262, 264 (N.D.Ill.1987) (applying *Henderson.*) On the other hand, the Tenth Circuit has reached the opposite conclusion, a decision which it recently reaffirmed.[5]

The question presented in the case at hand is whether the reach of our decisions in *Henderson* and the other circuits' decisions in *Marx* and *Myers* should be extended to instances where a state prosecutor is asked by a police officer to provide a legal opinion about the propriety of proposed investigative conduct.[6] Following this Circuit's reliance on *Butz*, we conclude that a prosecutor is absolutely immune from suit when acting as a legal advisor to police officers.

Admittedly, our review of the historical or commonlaw basis for the immunity in question does not yield any direct support for the conclusion that a prosecutor's immunity from suit extends to the act of giving legal advice to police officers. Nonetheless, an early decision by the Indiana Supreme Court reveals the breadth of the reasoning supporting the immunity at common law. In holding that a prosecutor is absolutely immune from suit for malicious prosecution, the court drew upon the following principle:

Whenever duties of a judicial nature are imposed upon a public officer, the due execution of which depends upon his judgment, he is exempt from all responsibility by action for the motives which influence him and the manner in which said duties are performed. If corrupt, he may be impeached or indicted; but he cannot be prosecuted by an individual to obtain redress for the wrong which may have been done.

*Griffith v. Slinkard*, 146 Ind. 117, 119, 44 N.E. 1001, 1002 (1896) (quoting Townsh. Sland. & L. (3d Ed.) § 227, pp. 395–96). Under this articulation of the common law principle, the dispositive question is whether the conduct of the prosecutor is of a judicial nature and requires the prosecutor to exercise analogous judgment. In *Henderson*, we concluded that when a state's attorney serves as the legal advisor to county officials, she functions in a manner similar to both her role as a prosecutor and to that of a judge. "[I]n both functions, the state's attorney has the responsibility to review the facts of a given case and to arrive at an opinion concerning legality.... when functioning as an advice giver, the state's attorney has the ultimate decision on legality." *Henderson*, 790 F.2d at 46. This same conclusion applies here since an Indiana prosecutor's statutory responsibilities are sufficiently parallel to those of an Illinois state's attorney. *See* I.C. 33–14–1–3 and 33–14–1–4.

Under *Butz*, the second factor we must consider is whether the prosecutor's functions as a legal advisor to police officers subjects the prosecutor to "the same obvious risks of entanglement in vexatious litigation as is characteristic of the judicial process." *Mother Goose*, 770 F.2d at 671. We have little doubt that a prosecutor's

---

5. In *Wolfenbarger v. Williams*, 826 F.2d 930 (10th Cir.1987), the Tenth Circuit revisited its decision in *Benavidez v. Gunnell*, 722 F.2d 615, 617 (10th Cir.1983) (district attorney is not absolutely immune from suit for giving legal advice to police officers), in light of this circuit's decision in *Henderson*. The *Wolfenbarger* Court declined to overrule *Benavidez* and reaffirmed that a district attorney's act of giving legal advice to police officers is not protected by absolute immunity.

6. At the outset, we must reject appellant's contention that Reed's act of presenting evidence before the county judge in the probable cause hearings was part of the investigative stage of the case rather than action taken "in initiating a prosecution and in presenting the state's case." *Imbler*, 424 U.S. at 431, 96 S.Ct. at 995.

risk of becoming entangled in litigation based on his or her role as a legal advisor to police officer is as likely as the risks associated with initiating and prosecuting a case. As the present case illustrates, police officers do turn to a prosecutor when they are uncertain about the legality of a possible investigative technique. And this is as it should be. We do not hesitate to recognize that the decision at hand should be guided, in part, by sound policy considerations. With that in mind, it is entirely likely that if prosecutors were granted only qualified immunity from suits for conduct relating to their role as the officers' legal advisor, the end result would be to discourage prosecutors from fulfilling this vital obligation. Police officers, in turn, would be left to take their best guess as to what a suspect's rights are. On balance, one of the central goals of the criminal justice system would be dramatically undercut. Police officers will be less well-informed about both their ability to employ certain investigative techniques, and the possibility that their proposed conduct will violate the rights of their suspects.

The third factor which we must consider is whether there are sufficient checks upon the prosecutor to prevent abuses of the authority to render legal opinions free from liability. The first check upon such abuses lies in the judicial process itself. As the Supreme Court has recognized, "the judicial process is largely self-correcting: procedural rules, appeals and the possibility of collateral challenges obviate the need for damages to prevent unjust results." *Mitchell v. Forsyth*, 472 U.S. 511, 522–23, 105 S.Ct. 2806, 2813–14, 86 L.Ed.2d 411 (1985). Prosecutors well know that investigative techniques resulting in the violation of a suspect's constitutional rights will result in the suppression of evidence prior to trial or on appeal. Furthermore, a prosecutor who abuses his or her powers will have to answer to the electorate every four

years. *See* Ind. Const., art. 7, § 16 (prosecutors elected every four years). Additionally, a prosecutor may be professionally disciplined. *Imbler*, 424 U.S. at 429, 96 S.Ct. at 994. Consideration of the foregoing factors reveals that a prosecutor should be afforded absolute immunity for giving legal advice to police officers about the legality of their prospective investigative conduct. We emphasize that a prosecutor steps outside of his or her quasi-judicial role when he or she actually participates in investigative conduct. Under our decision, such conduct is not accorded absolute immunity.

■ The remaining question is whether Reed merely gave legal advice to Officers Cox and Scroggins or whether he participated in the investigation. The officers testified that they called Reed at his home to seek his advice about the propriety of their intentions to hypnotize and question the appellant. Officer Cox testified that they called Reed because he was the police liaison for the Prosecutor's office. Both officers emphasized that they were seeking Reed's legal opinion about their proposed course of action. Based on the foregoing testimony, it is apparent that Reed was rendering legal advice to the officers and should be immune from suit, even if he did render unsound advice.[7]

For the foregoing reasons, the district court's order directing the verdict in favor of the defendant is hereby

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment and opinion of the court. I write separately to stress the limited scope of the court's holding. The court holds that a prosecutor enjoys absolute immunity with respect to *legal advice* given to law enforcement officers; it does not hold that such absolute immunity nec-

---

7. Appellant also argues that Reed's act of rendering a legal opinion to Officers Cox and Scroggins was the equivalent of a final decision by an official policy maker. Although the Supreme Court has confirmed that a single decision by a public official can amount to a policy decision, Reed did not purport to do anything

more than render his opinion about the conduct being proposed. *See Pembaur v. Cincinnati*, 475 U.S. 469, 484, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (respondent did not merely give legal advice, but was statutorily empowered to establish county policy). Appellant's reliance on *Pembaur* is unavailing under these facts.

essarily extends to situations in which the prosecutor goes beyond rendering legal advice and assumes responsibility for the management of the investigation. The line between rendering legal advice and making policy decisions during an investigation is a relatively difficult one. *See Imbler v. Pachtman,* 424 U.S. 409, 431 n. 33, 96 S.Ct. 984, 995 n. 33, 47 L.Ed.2d 128 (1976). Here, however, the record supports the district court's explicit conclusion that the prosecutor's role was limited to rendering legal advice. On that basis, I join the judgment and opinion of the court.